UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNITA FORCE,

        Plaintiff,                  Case No.  03-71618

v.                                    District Judge Nancy G. Edmunds
                                       Magistrate Judge R. Steven Whalen

AMERITECH CORPORATION, Inc.,
a Delaware corporation,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Arnita Force brings this action pursuant to Section 502 of the Employees Retirement Income Security Act (ERISA), 29 U.S.C. §1132(a)(1)(B), alleging wrongful termination of Long Term Disability (LTD) benefits. Before the Court are Plaintiff's Motion for Judgment on the Administrative Record Reversing Defendant's Denial of Benefits [Docket #24] and Defendant's Motion for Entry of Judgment [Docket #25], which have been referred for Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Plaintiff's Motion for Judgment [Docket #24] be GRANTED and that Defendant's Motion for Entry of Judgment [Docket #25] be DENIED.

**I.  PROCEDURAL HISTORY**

Plaintiff was employed by Defendant since September of 1978, last actively working in July of 1994 as a manager in the Publishing Graphics Center. On July 4, 1994, she was involved in a car accident, and applied for short term disability benefits, which she received

for 52 weeks, from August 1994 through August 1995 (AR 217).[1] After this one-year period, Plaintiff applied for and received Long Term Disability (LTD) benefits from August 1995 through May 1998 (AR 1-3).

On March 24, 1998, Defendant informed Plaintiff that it was terminating LTD benefits (AR 8). Plaintiff administratively appealed this decision, and a final denial letter was issued on October 21, 1998 (AR 1). Plaintiff filed a Complaint in this Court, and while the case was pending, the parties stipulated to a remand to reevaluate Plaintiff's entitlement to LTD benefits based on additional material. Following this reevaluation, the Defendant again issued a final denial letter on November 8, 2004, and Plaintiff re-instituted the present case.

## II. FACTS

Following her automobile accident in July, 1994, Plaintiff treated with Dr. Howard Schwartz, M.D., who initially diagnosed cephalgia,[2] cervical strain and right shoulder strain, deeming her disabled for an indefinite period (AR 112). Imaging studies conducted approximately one week after the accident, July 12, 1994, revealed osteophytic spurring of C5-C6, with a fracture of the osteophyte inferior plate, and diminished disc space at C4-C5 (AR 114). On August 5 and September 9, 1994, Dr. Schwartz indicated on Disability Certificates that Plaintiff was precluded from bending, lifting, twisting and prolonged standing (AR 115, 121).

On June 21, 1995, Dr. Schwartz completed a Statement of Functional Capacity in which he noted that Plaintiff had severe limitations in driving, walking, standing, sitting,

---

[1] "AR" refers to the Administrative Record, filed as Exhibit A to Defendant's Motion for Entry of Judgment.

[2] Cephalgia refers to headaches or head pain.

pushing, pulling, reaching, climbing stairs, changing positions (sit/stand), finger dexterity and repetitive movements (AR 149-50).

On September 11, 1996, Dr. Schwartz wrote that Plaintiff suffered from chronic pain syndrome, low grade cervical and lumbar radiculopathy, and tenderness of the right wrist (AR 136-37). In terms of Plaintiff's functional limitations, Dr. Schwartz wrote that she was precluded from "reaching, pushing, repetitive movements, climbing, bending, stooping. . . She should also avoid any prolonged sitting (not more than 30 minutes), or standing (not more than 10 minutes), because of her chronic pain. It is advisable and necessary that she have bed rest several times during the day." *Id.* He indicated that Plaintiff had reached her "maximum benefit" from physical therapy, so no further course of treatment was indicated, although he did state that a referral to a chronic pain clinic "might be beneficial." *Id.* Finally, Dr. Schwartz stated, "Unless and until her condition significantly improves, she will remain totally disabled from any employment." *Id.*

Two days after Dr. Schwartz rendered this opinion, MetLife, the third party administrator for Ameritech, wrote to Plaintiff advising her that "[b]ased on the medical information in [her] claim file," she might be eligible for Social Security disability benefits and that it was to her advantage to receive such benefits (AR 199-200). The letter also stated that MetLife had provided Ms. Force's name and contact information to Kennedy & Associates, a law firm "that specializes in obtaining Social Security Disability Insurance Benefits for claimants," and advised that Kennedy & Associates would contact her. *Id.* Subsequently, Plaintiff applied for and received Social Security disability benefits retroactive to her date of onset of disability (July 1994). Because LTD benefits are offset by Social Security benefits, Plaintiff repaid Ameritech $26,396.67 by cashier's check dated June 18, 1997 (AR 96-97).

A CT scan performed on January 25, 1997 revealed spinal stenosis at C5-C6, a mild diffuse bulge at C2-C3 and C3-C4, narrowing of the left L4-L5 neural foramen, and "evidence of a congenital anomaly involving L5 vertebra and the upper sacrum associated with a rotary scoliosis." (AR 158-59). (This report was signed by Dr. James Selis, M.D.).

Dr. Armando Ortiz, M.D., to whom Plaintiff was referred for consultation by Dr. Schwartz, noted in a March 11, 1997 letter that following the July 4, 1994 automobile accident, Plaintiff developed pain in the back and the cervical spine (AR 153-54), and that although she continued on a pattern of improvement for a period of time, she complained the past year of persistent pain "with the same pattern and localization and severity." *Id.* Although Dr. Ortiz found slight limitation of movements of the cervical spine because of pain, he stated that Plaintiff "has no other focal localized neurological findings." *Id.* Reviewing the CT scan of January 25, 1997 (described in the preceding paragraph), Dr. Ortiz found evidence of cervical spondylosis,[3] stating:

> "In a patient that has had trauma, the question is whether spondylosis has been due to the trauma, or not. In her case, I am inclined to believe that there was a pre-existing condition which was definitely aggravated by the accident, and is causing now the subjective complaints that the patient has. The lesion is at C5-C6, and is a localized moderate spondylotic change, so it relates well with the history of trauma." *Id.*

On May 5, 1997, Connie Neier, Defendant's LTD specialist, wrote a referral letter to a Dr. Simon, noting Dr. Schwartz's findings of September 11, 1996, and asking Dr. Simon to review the CT scan. Neier stated that "although there are some objective findings, I am questioning such severe restrictions." (AR 89). The Administrative Record does not contain any report or other response from Dr. Simon.

---

[3] Cervical spondylosis is a degenerative joint disease of the cervical spine, which results in a progressive erosion of the cartilage which lines the weight-bearing joints in the neck. This can lead to progressive destruction of nerve roots, causing pain. *Online Medical Dictionary*, http://cancerweb.ncl.ac.uk/omd/.

In December of 1997, Plaintiff underwent a Functional Capacity Evaluation (FCE) at the Defendant's request. The FCE report, written on January 12, 1998 by Scott McKay, a non-physician occupational therapist, first noted that "Ms. Force presents with significant impairments which may adversely affect return to work." (AR 32). The FCE also stated that application of objective tests such as the Blankenship System Behavioral Profile showed "minimal symptom/disability exaggeration" which "did not significantly affect the FCE results." *Id.* Notwithstanding these objective findings, Mr. McKay commented that the Plaintiff's "comments in regard to her limited abilities could be construde (sic) as symptoms [of] exaggeration, as her comments were consistently underestimating her abilities." *Id.* Ultimately, Mr. McKay concluded that Plaintiff's "current functional abilities are consistent with the sedentary classification of work demand," and that based on what he considered Plaintiff's ability to stand and walk frequently, "this would classify performance at sedentary-light." *Id.* He also recommended a "work conditioning program." *Id*.

On March 3, 1998, Kathleen Roche, a non-physician "Return-To-Work Specialist," prepared a transferable skills analysis at the request of Ameritech's Connie Neier (AR 22-24). Citing Dr. Ortiz's March 11, 1997 report and the FCE performed on December 22, 1997, Ms. Roche opined that Plaintiff could perform sedentary work, and listed 10 possible jobs in addition to her former employment at Ameritech. *Id.*

Three weeks later, on March 24, 1998, Ms. Neier sent Plaintiff a letter terminating her LTD benefits, specifically referring to the 1997 FCE (AR 8-9). Plaintiff timely requested an administrative appeal (AR 5), and also submitted the medical findings of Dr. Michael Sutton and Dr. Daniel Elskins. Dr. Sutton's notes, dated June 17, 1998, indicated that "[t]here appears to be a significant sagittal stenosis due to midline disc herniation...." (AR 1c). Dr. Elskin's letter, dated June 30, 1998, noted "degenerative disc disease at C5-C6, with

kyphosis and significant spinal canal compromise." He discussed surgery, but noted "the major risk that she would still have persistent symptoms afterward." He nevertheless deemed Plaintiff a candidate for an anterior cervical discectomy and fusion at C5-C6. (AR 1d-1e).

On October 21, 1998, Defendant Ameritech issued a final denial letter, stating that "the Committee did not observe physical findings or results of diagnostic testing that demonstrates you are incapable of sedentary work." (AR 1). In making this determination, the Defendant relied on the 1997 FCE. *Id.*

### III.   STANDARD OF REVIEW

Under ERISA, when a plan administrator or employer has the discretionary authority to determine eligibility for benefits, federal courts review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168-69 (6th Cir. 2003), quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th cir. 1996). "[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)(internal citations and quotations omitted).

Nevertheless, "[d]eferential review is not no review, and deference need not be abject." *McDonald, supra*, 347 F.3d at 172 (internal citations omitted). *See also Hackett v. Xerox Corp. Long-Term disability Income Plan*, 315 F.3d 771, 774-75 (7th cir. 2003) ("Review under the deferential arbitrary and capricious standard is not a rubber stamp and

deference need not be abject. Even under the deferential review we will not uphold a termination when there is an absence of reasoning in the record to support it"); *Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) ("Although we review the committees' actions in a deferential light, we shall not rubber stamp their decisions."); *Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 796 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits where, considering all the evidence, its reasoning is not trustworthy."). As the Sixth Circuit stated in *McDonald*, 347 F.3d at 172:

> "[T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence–no matter how obscure or untrustworthy–to support a denial of a claim for ERISA benefits."

## IV.   ANALYSIS

Before embarking on the obligatory review of the medical evidence in the Administrative Record, *McDonald, supra*, it is necessary to frame that analysis in the context of two other factors that support the conclusion that the denial of LTD benefits in this case was arbitrary and capricious. First, Defendant Ameritech is the plan funder, and has, through its Benefits Committee, the authority to grant or deny LTD benefits (AR 250). In other words, Ameritech is authorized both to decide eligibility for benefits and to pay those benefits, creating an apparent conflict of interest. Secondly, Defendant's denial of LTD benefits conflicts with the Social Security Administration's grant of disability benefits.

### A.  Conflict of Interest

Where, as here, the employer or fiduciary "is authorized both to decide whether an employee is eligible for benefits and to pay those benefits[,] [t]his dual function creates an apparent conflict of interest."  *Glenn v. MetLife and Long Term Disability Plan for Associates of Sears, Roebuck and Company*, __F.3d__ (6th Cir. 2006)(Docket No. 05-3918, decided and filed 9-1-06, Slip Opinion at 5).  That conflict of interest is a relevant factor in considering whether the denial of benefits was arbitrary and capricious.  *Id., citing Firestone Tire & Rubber Co. V. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'") (internal citation omitted).

### B.  Social Security Benefits

In denying LTD benefits, the Defendant made no reference to the Plaintiff's receipt of Social Security Disability Benefits, and indeed, there is no indication in this record that the Defendant took that fact into account.  While the Social Security Administration's decision is not binding on the Defendant, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)*,* such a determination is highly relevant, and cannot simply be ignored.  The Sixth Circuit in *Calvert v. Firstar Finance, Inc*., 409 F.3d 286, 294 (6th Cir. 2005), held:

> "[T]he SSA determination, though certainly not binding, is far from meaningless. As the Court said in *Black & Decker,* a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians. 538 U.S. at 834, 123 S.Ct. 1965. Here, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective support for [the treating physician's disability opinion]."

In addition, it is significant that the Defendant in this case encouraged the Plaintiff to

file for Social Security benefits, even to the extent of referring her to a law firm, and that after she received those benefits, Ameritech reaped a financial benefit to the tune of a $26,396.37 reimbursement from Plaintiff.[4] The Sixth Circuit in *Glenn* discussed this scenario as analogous to the doctrine of judicial estoppel, where a party takes inconsistent positions in two proceedings. In other words, Defendant is happy to reap the benefit of the SSA's finding of disability by accepting the reimbursement and offset, but takes the opposite view of disability in terminating LTD benefits altogether. The *Glenn* court quoted *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) as follows regarding what Judge Posner termed the penumbra of judicial estoppel:

> "The grant of social security disability benefits...brings this case within the penumbra of the doctrine of judicial estoppel–that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. The doctrine is technically not applicable here, because MetLife and ITT, the defendants in this suit, were not parties to the proceeding before the Social Security Administration. Yet they 'prevailed' there in a practical sense because the grant of social security benefits to Ladd reduced the amount of her claim against the employee welfare plan. If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration, going so far as to provide her with legal representation. To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated. In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it foes not provide an independent basis for rejecting that evaluation."

*Glenn*, Slip Opinion at 6-7.

*Glenn* also noted that in *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 530 (6th Cir. 2003), the Sixth Circuit adopted the Seventh Circuit's "penumbra" rationale. "[In

---

[4] Interestingly, the law firm to which the Plaintiff was referred–Kennedy & Associates–was the same law firm to which the plaintiff in *Glenn* was referred.

*Darland*] we concluded that 'a plan administrator's decision denying disability benefits where the Social Security Administration has determined that the applicant was totally disabled' can be considered arbitrary and capricious, especially where 'it is plainly evident that the Social Security standard for disability determination is much more stringent than that required by [the defendant's] insurance policy.'" *Glenn*, Slip Opinion at 7 (internal citations omitted).

Likewise in this case, the Defendant's complete disregard of the SSA's disability determination supports a finding that the denial of LTD benefits was arbitrary and capricious. As *Darland* and *Glenn* observed, it is difficult to qualify for Social Security Disability benefits. The standard is stringent: the claimant must lack the functional capacity to perform *any* jobs existing in significant numbers in the national economy. *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). SSA benefits are not given to malingerers or people who suffer from a few aches and pains; they are reserved for seriously disabled workers.

As in *Glenn* and *Ladd*, Defendant in this case not only ignored the SSA's disability determination in making its decision to terminate LTD benefits, but that decision was inconsistent with acceptance of the SSA's disability finding when it was to Defendant's benefit to do so. In this Court's determination of whether the termination of benefits was arbitrary and capricious, this "is obviously a significant factor to be considered upon review." *Glenn*, Slip Opinion at 8.

### C.   Medical Evidence

As discussed above, it is in the context of the Defendant's inherent conflict of interest and the "penumbra" of judicial estoppel that the medical support for its decision to terminate LTD benefits must be assessed. A review of the Administrative Record shows that the

Defendant relied on selective portions of the medical records that seemed to support its decision, while ignoring more substantial records that clearly supported a finding of disability. In addition, the Defendant placed undue weight on non-physician opinions, disregarding clinical findings of Plaintiff's treating doctors.

In the initial denial letter of March 24, 1998 (AR 8-9), Ms. Neier, Ameritech's LTD Specialist, relied on the FCE of December, 1997, omitting all reference to any physicians' reports, including Plaintiff's treating physician, Dr. Schwartz. The final denial letter of October 21, 1998 also references the FCE and states, without any elucidation, that "[i]n the records provided for your claim, the Committee did not observe physical findings or results of diagnostic testing that demonstrate you are incapable of sedentary work." (AR 1). This letter also indicated the absence of "any neurological abnormalities," presumably referencing the March 11, 1997 report of Dr. Ortiz (AR 153-54).

The FCE (AR 30-34), upon which the Defendant placed such great weight in its decision, was generated following an examination by a non-physician occupational therapist, and did not incorporate any clinical findings by physicians. Although the report concludes that Plaintiff is capable of at least sedentary employment, it also notes that she has "significant impairments which may adversely affect return to work," (AR 32), and states that digital tenderness mapping (DTM) results "appear to be associated with a specific low back pain syndrome. This result appears to correlate with true medical impairment and disability." (AR 31-32). In addition, although objective profiling (the Blankenship System Behavioral Profile) showed "minimal symptom/disability exaggeration," the author of the report related his subjective impression that Plaintiff was exaggerating her symptoms (AR 32). Thus, the FCE appears to be to a fair degree internally inconsistent with regard to both functional capacity and the Plaintiff's credibility.

To the extent that the final denial letter relied on Dr. Ortiz's finding of "no other focal localized neurological findings" (AR 153), taken out of the context of the report, it amounts to a misrepresentation of the physician's opinion. Significantly, Dr. Ortiz also found cervical spondylosis as a pre-existing condition that was "definitely aggravated by the accident, and is causing now the subjective complaints (i.e., pain) that the patient has" (AR 154). This finding correlates well with the CT scan of January 25, 1997, which showed "evidence of a congenital anomaly involving L5 vertebra and the upper sacrum associated with a rotary scoliosis" (AR 158-59). Thus, Dr. Ortiz's observation that there were no localized neurological findings (other than limitation of movement of the cervical spine because of discomfort) does not negate his finding that the Plaintiff's subjective pain symptoms had their etiology in a pre-existing spondylosis that was aggravated by the accident.[5] When read in conjunction with Dr. Schwartz's records and the CT scan, Dr. Ortiz's letter supports, rather than negates a finding of disability. Stated differently, there are no *physicians*' opinions that contradict the conclusion of the Plaintiff's treating physician that she suffers from disabling pain.

Concerning Dr. Schwartz: On May 5, 1997, Ms. Neier wrote a referral letter to a Dr. Simon questioning the limitations set forth by Dr. Schwartz, but there is no response or report from Dr. Simon in the Administrative Record.[6] Nowhere in either the initial or final administrative denial letters is Dr. Schwartz mentioned. Given that Dr. Schwartz was the

---

[5] The "Transferable Skills Analysis" prepared by Kathleen Roche on March 9, 1998 (AR 22-24) also references the FCE and Dr. Ortiz's report, but not records from Dr. Schwartz or any other treating source.

[6] In her letter, Ms. Neier acknowledged that "there are some objective findings," and requested a review of the CT scan (AR 89). In an Ameritech form dated November 13, 1997, Ms. Neier showed some apparent ambivalence about terminating LTD benefits. Noting that Plaintiff's benefits were suspended on October 1, 1997, she wrote, "I would like to reinstate her." (AR 12).

Plaintiff's treating physician since the 1994 accident, it was an abuse of discretion for the Defendant to simply ignore his clear finding of disability in favor of the conclusions of non-physicians and other portions of the medical record taken out of context.  I recognize, as discussed above, that the Supreme Court has held that, unlike the rule in Social Security disability cases, treating physicians are not given deference in ERISA review.  *Black & Decker Disability Plan, supra*, 538 U.S. at 832-33, 123 S.Ct. at 1965.  Nevertheless, the Court in *Black & Decker* felt constrained to add that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.*  This is particularly true where the treating physician has had the opportunity to fully examine the claimant.  *Kalish v. Liberty Mutual/Liberty Life Assurance Co. Of Boston*, 419 F.3d 501, 507 (6th Cir. 2005).

In addition, the June 30, 1998 report of Dr. Elskins (AR 1d-1e) corroborates Dr. Schwartz's conclusions, noting that Plaintiff suffers from degenerative disc disease with kyphosis "*and significant spinal canal compromise*," which would tend to account for the pain.  Dr. Elskins also recommended major surgery (an anterior cervical discectomy and fusion at C5-C6), with the proviso that there was a "major risk that she would still have persistent symptoms afterward." *Id.*

Finally, in denying benefits the Defendant made no mention of the SSA's disability finding that it so readily accepted when it sought reimbursement for the set-off.  *See* sec. B, *supra*.  The Defendant's failure to accord *any* weight to the SSA's finding amounts to a distortion of the record.

The Defendant's decision to deny benefits to this long-term employee is highly suspect.  As discussed above, Ameritech was operating under a conflict of interest because it both determined eligibility and paid the benefits.  Its claim that the Plaintiff is not disabled

is inconsistent with its previous acceptance of the SSA's disability finding, a finding that was rendered only after the Defendant encouraged Plaintiff to apply for Social Security Disability benefits, and provided her with a lawyer to help her obtain those benefits. Against that backdrop, the Defendant ignored or distorted medical findings of doctors that showed disability in favor of its own non-physician "experts" who concluded, based on a selective reading of the record, that Plaintiff was capable of sedentary work. Taking all of these factors into consideration, I conclude, as did the Sixth Circuit in *Glenn*, *supra*, that the Defendant's decision to deny benefits was arbitrary and capricious. Accordingly, the Plaintiff's Motion for Summary Judgment should be granted, and the case remanded for an award of benefits.

## V.   CONCLUSION

I recommend that Defendant's Motion for Entry of Judgment [Docket #25] be DENIED; that Plaintiff's Motion for Judgment [Docket #24] be GRANTED; and that the case be remanded for an award of benefits retroactive to the date they were terminated.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                          S/R. Steven Whalen
                          R. STEVEN WHALEN
                          UNITED STATES MAGISTRATE JUDGE

Dated: September 5, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 5, 2006.

                          S/Gina Wilson
                          Judicial Assistant